Estate of Lillian Virginia Sperling, Deceased, Warren Richard Sperling, Administrator v. Commissioner.
Estate of Sperling v. Commissioner
Docket No. 88167.
United States Tax Court
T.C. Memo 1963-260; 1963 Tax Ct. Memo LEXIS 81; 22 T.C.M. (CCH) 1301; T.C.M. (RIA) 63260; September 26, 1963
*81 1. Husband signed wife's name to waivers extending time within which to assess deficiencies on joint returns for 1951 and 1952. Held, assessment of deficiencies against wife for those years barred by statute of limitations. 2. Held, petitioner not entitled to deductions for purchases in excess of amounts allowed by respondent for the years 1953 and 1954. 3. Held, petitioner is entitled to dependency credit for son for year 1953. 4. Held, petitioner not entitled to deduction for alleged Christmas gifts for 1954. 5. Held, petitioner is liable for additions to tax for negligence for the years 1953 and 1954. Morris Horowitz, 120 W. 42nd St., New York, N. Y., for the petitioner. Eugene L. Wilpon for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioner's income tax and additions thereto under sections 293(a) and 294(d)(1)(A)[1] as follows: Deficiency
Additions to tax
Sec. 294
Year
Income tax
Sec. 293(a)
(d)(1)(A)
1951
$ 5,579.04
$278.95
$ 638.46
1952
2,721.20
136.06
402.16
1953
18,454.44
922.72
1,897.59
1954
5,032.06
251.60 [2]
637.70
*82 The issues for decision are: (1) Whether assessment of deficiencies for the taxable years 1951 and 1952 is barred by the statute of limitations; (2) Whether, in computing net income for the taxable years 1951, 1952, 1953, and 1954, petitioner is entitled to deductions from gross receipts, in addition to those claimed on the returns, in the amount of $48,044.88, allegedly representing purchases of metal from Kastenhuber & Lehrfeld, Inc. (hereafter called K & L); (3) Whether respondent erred in disallowing certain alleged cash purchases as petitioner's cost of goods sold during the taxable years in controversy; (4) Whether petitioner is entitled to a dependency credit for Warren Sperling (hereafter called Warren) for the taxable year 1953; (5) Whether petitioner is entitled to a deduction in the amount of $1,000 for 1954 for Christmas gifts; and (6) Whether petitioner is liable for the addition to tax for negligence under section 293(a). Petitioner introduced no evidence with respect *83 to certain other adjustments determined in the notice of deficiency, and with respect to the addition to tax for failure to file declarations of estimated tax, and does not argue these points on brief, so we assume these issues have been abandoned. Findings of Fact Some of the facts are stipulated and are found accordingly. Warren is the duly appointed and acting administrator of the estate of hismother, Lillian Virginia Sperling (hereafter called Lillian), deceased. Lillian was married to Eugene Sperling (hereafter called Eugene) during the taxable years 1951, 1952, 1953, and 1954, and they filed joint Federal income tax returns for the taxable year 1951, 1952, and 1954 with the (collector) district director of internal revenue, Lower Manhattan District of New York. They filed a joint Federal income tax return for the taxable year 1953 with the district director of internal revenue, Upper Manhattan District of New York. The return for 1951 was filed on or about March 14, 1952; the return for 1952 was filed, pursuant to an extension granted, on or about June 12, 1953. Lillian and Eugene executed a Form 872, Consent Fixing Period of Limitation Upon Assessment of Income and *84 Profits Tax, by which they agreed to extend the statutory period for the assessment of a deficiency for 1951 to June 30, 1956. They signed this form on or about January 11, 1955; the consent was executed on behalf of respondent on January 13, 1955. A similar consent form for the year 1951 in the names of Eugene and Lillian was signed by Eugene who wrote the names "Eugene Sperling" and "L. V. Sperling" in the spaces indicated for taxpayers' signatures. This consent form was signed on behalf of respondent on December 19, 1955, and recited that the period for the assessment of a deficiency for 1951 was to be extended to June 30, 1957. A consent form in the names of Lillian and Eugene, purporting to extend the period for the assessment of a deficiency for the taxable year 1952 to June 30, 1957, was signed by Eugene, who wrote the names "Eugene Sperling" and "L. V. Sperling" in the spaces indicated for taxpayers' signatures. This consent form was executed on behalf of respondent on December 19, 1955. Succeeding consent forms for the years 1951 and 1952, each signed prior to the expiration of the period agreed upon in the next preceding agreement but subsequent to June 30, 1956, were *85 executed by Lillian individually and as executrix of Eugene's estate, and, after Lillian's death, by Warren as administrator of Lillian's estate. [3] The last of these extended the time of assessment of deficiencies for 1951 and 1952 to June 30, 1960. The statutory notice of deficiency herein was issued on April 21, 1960. Until his death in 1956 Eugene was engaged in the business of refining precious metals, processing and refining "sweeps," and buying and selling scrap metals. "Sweeps" are floor sweepings collected by jewelry manufacturers and polishers in the process of manufacturing and are sold to refiners, such as Eugene, who remove and process the precious metal. Eugene dealt in scrap platinum and gold which he refined, formed into bars, and analyzed. He submitted bids on the assay. If Eugene did not buy the metal from the owner of the sweeps or the scrap, he would return the metal to the owner whom he would charge for the expense of processing. During the Korean War, from 1950 to 1953, there was a shortage of metals in Eugene's business and there was a black *86 market in which metals were bought and sold for cash. Eugene did business during the period with persons who insisted on dealing in cash. Eugene maintained a journal showing receipts and disbursements of cash and the account, such as purchases or sales, to be debited or credited in a particular transaction. He also maintained a bound book in which he kept ledger accounts. Totals from the journal were posted monthly to the ledger accounts, one of which was for purchases. Yearly totals from the purchases account were reported by Eugene on tax returns filed by him. One firm with which Eugene dealt was K & L, which was in the business of refining precious metals, and during the period 1951 through 1954, K & L refined metal for him. K & L maintained a ledger account to reflect transactions with Eugene. This account was debited with amounts of cash advanced to Eugene and with amounts for metal bought by him from K & L and for processing expenses. The account was credited with amounts which he paid K & L by cash or check for metal purchased and with amounts for metal sold by him to K & L. Total debits and credits to the account for the years 1951 through 1954 were as follows: Year
Debits
Credits
1951
$ 82,399.38
$ 81,905.61
1952
114,349.29
102,185.41
1953
258,123.29
268,279.67
1954
191,118.42
173,080.45
$645,990.38
$625,451.14
*87 Total debits and credits for metal were as follows: Year
Debits
Credits
1951
$ 13,151.43
$ 55,408.52
1952
37,655.32
72,328.12
1953
165,394.00
90,535.04
1954
109,655.54
59,539.73
$325,856.29
$277,811.41
Debits for amounts of cash paid to Eugene in 1951, 1952, 1953, and 1954 were in the respective amounts of $54,343.89, $69,091.05, $85,176.35, and $75,000. Credits for amounts received from Eugene in cash for the years 1951, 1952, 1953, and 1954 were in the respective amounts of $17,461.45, $29,824.29, $177,744.63, and $113,326.45. Eugene's books showed sales receipts in cash from K & L for the years 1951, 1952, 1953, and 1954 in the respective amounts of $54,343.89, [4] $69,091.05, $85,176.35, and $75,000. [4] The books showed purchases from K & L for the years 1951, 1952, 1953, and 1954 in the respective amounts of $23,967.34, $10,881.85, $56,672.67, and $108,405.27. In determining the deficiencies herein respondent has disallowed as purchases as claimed on Eugene's returns *88 the following items, representing checks drawn payable to cash and recorded as purchases: 1951
Jan. 9
$ 885.00
Jan. 22
600.00
Jan. 24
1,250.00
Apr. 11
1,200.00
June 14
820.00
June 20
1,150.00
July 2
260.00
Total
$ 6,165.00
1952
Jan. 6
$ 920.00
Feb. 2
715.00
Feb. 8
820.00
Feb. 15
660.00
Feb. 21
1,350.00
Feb. 21
1,950.00
Apr. 25
400.00
May 9
400.00
May 9
443.23
Dec. 18
1,650.00
Total
$ 9,308.23
1953
May 29
$ 6,000.00
June 25
3,000.00
June 25
2,000.00
July 14
1,500.00
July 22
977.50
July 27
491.25
Aug. 12
807.40
Aug. 12
500.00
Aug. 17
450.00
Aug. 18
950.00
Aug. 18
353.34
Aug. 19
1,500.00
Aug. 20
500.00
Oct. 1
1,000.00
Oct. 2
1,500.00
Oct. 5
500.00
Oct. 6
270.00
Nov. 9
600.00
Nov. 12
1,500.00
Nov. 17
900.00
Nov. 19
1,000.00
Nov. 23
2,000.00
Nov. 24
850.00
Nov. 25
1,400.00
Nov. 27
950.00
Dec. 2
980.00
Dec. 3
1,250.00
Dec. 21
840.00
Total
$34,569.49
1954
Jan. 6
$ 1,100.00
Jan. 14
640.00
Jan. 15
3,000.00
Jan. 24
4,000.00
Jan. 29
1,450.00
Feb. 4
4,000.00
Feb. 8
1,000.00
Total
$15,190.00
The above checks dated November 19, 1953, and October 6, 1953, in *89 the respective amounts of $1,000 and $270 were endorsed and cashed by one of Eugene's employees who did general work around the plant. The employee returned the money to Eugene, who put it in an envelope. The above checks dated July 27, 1953, and August 18, 1953, in the respective amounts of $491.25 and $353.34 were endorsed by Warren, who did odd jobs in Eugene's office in 1953. Warren gave the proceeds from the checks to Eugene, and he supposed that the money was used to pay for Eugene's purchases of sweeps or metal. After Eugene's death an accountant retained by petitioner went through the records left by Eugene and found what purported to be a bill rendered to Eugene. This bill was on a printed form of M. Nassel (hereafter called Nassel), a diamond sawyer with whom Eugene did business. This bill was dated June 5, 1953, and purports to be in the amount of $14,949.65 for 160.749 ounces of platinum at 93 cents per ounce. It was handwritten, is not marked "paid," and is not signed or initialed by Nassel. There is no indication on it that it was prepared by Nassel. The first six checks in the above list of alleged purchases disallowed for 1953 total $13,968.75. Warren, who went *90 through his father's records after his death, supposed that these six checks were in payment of the Nassel bill dated June 5, 1953, and that the difference between the stated amount of the Nassel bill and the total of the six checks was due either to a variance in the weight of the platinum delivered or in the price of platinum on the date of delivery. In determining the deficiencies herein, respondent has allowed as cash purchases items recorded as cash purchases supported by bills similar to the Nassel bill of June 5, 1953, where the cash check was in the exact amount of the bill and dated near the same date. Eugene's books show the following cash disbursements for purchases near the dates of the six checks totaling $13,968.75: June 4 - "cash"
$6,000.00
June 25 - "cash"
3,000.00
June 25 - "cash"
2,200.00 [1]
July 14 - "cash"
1,500.00
July 22 - "cash"
977.50
July 23 - "cash"
491.25
Eugene's records also included a bill on a printed form of Louis Rudisch, Inc. (hereafter called Rudisch), a refiner of precious metal. This bill form, completed in pencil, purported to be a bill rendered Eugene for 5,000 ounces of silver *91 nitrate at 50 cents per ounce, for a total of $2,500. It is dated February 5, 1954, and is made out to "E. Sperling." It also has the following notations: Holding
$29,000
5 [Illegible]
$24,000 Bal
Paid
[Illegible]
R
Eugene's books show at least 50 transactions with Rudisch during the 4 years in controversy. Reflected in Eugene's books for 1954 are disbursements of cash for silver nitrate on February 3 and February 8, 1954, in the respective amounts of $4,000 and $1,000. There is no disbursement recorded in February in the amount of $2,500, but there is a disbursement by check made payable to "L. Rudisch" in the amount of $3,039.40 on February 4, 1954. Eugene reported the following net profits from his business for 1951, 1952, 1953, and 1954: 1951
1952
1953
1954
Receipts
$118,613.43
$320,024.98
$448,561.23
$258,653.67
Cost of goods sold: Beginning inventory
11,250.00
2,130.00
14,150.00
5,860.00
Purchases
71,491.78
306,045.04
411,258.25
221,841.50
Materials and supplies
2,554.53
Ending inventory
2,130.00
14,150.00
5,860.00
4,620.00
Gross profit
38,001.71
25,999.94
29,012.98
33,017.79
Expenses
26,125.33
18,253.02
19,169.51
17,866.18
Net profit
11,876.38
7,746.92
9,843.47
15,151.61
*92 Eugene's available books and records include no inventory records. Eugene employed a bookkeeper who maintained his books and records during the years 1951, 1952, 1953, and 1954. He was not called as a witness in this proceeding. Warren began working for his father in 1949 and worked in his business until 1951 when he went into the service. He served in Korea and Japan and was discharged on January 17, 1953, when he returned to live with his mother and father, who supported him and provided him with spending money throughout 1953. He worked occasionally in his father's business in 1953 but was not otherwise gainfully employed. At Christmas time Eugene made gifts of cash to bank tellers and officers, policemen, firemen, and mailmen. Petitioner claimed a deduction for such gifts as selling expense in the amount of $1,000 for the taxable year 1954, which respondent disallowed. Ultimate Findings The assessment and collection of a deficiency for either of the taxable years 1951 or 1952 is barred, as against petitioner, by the statute of limitations. Petitioner is entitled to a dependency credit for Warren for the taxable year 1953. Eugene did not make expenditures for purchases *93 in his business in 1953 or 1954 in excess of those allowed by respondent. Petitioner is not entitled to a deduction in 1954 for gifts made at Christmas. Part of the deficiency for each of the taxable years 1953 and 1954 is due to negligence. Opinion The first issue is whether the assessment and collection of a deficiency for either 1951 or 1952 is, as against petitioner, barred by the statute of limitations. Lillian and Eugene filed a joint return for 1951 on or about March 14, 1952, and a joint return for 1952 on or about June 12, 1953. The statutory notice of deficiency was issued April 21, 1960, a date after the usual period for the assessment of a deficiency for either year, but as an exception to the statute of limitations, respondent has pleaded and relies on consents by which it is argued the statutory periods were extended. Consent forms were in fact executed for both years, each prior to the extended period agreed upon in the preceding one. These forms were signed by Eugene before his death, then by Lillian after his death, and finally by Warren as administrator after Lillian's death, and they were executed on behalf of respondent. The forms, as regards Eugene, were *94 properly executed. However, one consent form for 1951 and one for 1952, each a link in the chain of agreements extending the periods for assessment, were signed not by Lillian but only by Eugene. It is obvious that as Warren, who was of course familiar with his parents' signatures, has testified, Eugene signed Lillian's name to the consents. A comparison of the handwriting on the consents with the many copies of Eugene's signature in evidence makes this conclusion inescapable. Respondent argues that it must be presumed that Lillian's signature was executed by her, but we need not, and cannot, indulge such a presumption in the face of the facts. Since the filing dates of the returns are undisputed the burden is upon respondent to plead and to prove the exception to the statute upon which he relies. Harry Ekdahl, 18 B.T.A. 1230 (1930), and cases cited therein. There is no evidence that Eugene was acting on Lillian's behalf in signing her name to the consents; the scant evidence is to the contrary. Warren has testified that his father had no authority to act generally for his mother, and there is no indication that Lillian acquiesced in Eugene's act or represented to *95 respondent that Eugene had authority to execute the consent for her [5] or that it was her signature on the form. Under the circumstances we hold that respondent has not proved that the statutory periods for assessment of deficiencies for 1951 and 1952 were extended, as against petitioner, by valid consents. See Harry Ekdahl, supra.
The next issues are concerned with whether, in computing petitioner's income tax liability for 1953 and 1954, there are to be allowed purchases for Eugene's business in excess of those allowed by respondent in determining the deficiencies herein. Respondent has disallowed certain cash purchases which were claimed on the returns filed by Lillian and Eugene; petitioner contends that these cash purchases are to be recognized in computing Eugene's cost of goods sold. In addition, petitioner maintains that Eugene's purchases for the 4-year period 1951 *96 through 1954 should include the amount of $48,044.88, representing purchases from K & L that were not claimed on Eugene's returns. Eugene was a refiner of precious metals. He also dealt in scrap metal. During the period with which we are concerned there was a black market in the metals in which he dealt and petitioner's evidence shows clearly that persons from whom he bought metals at prices in excess of Government-regulated prices insisted on cash from Eugene. The evidence shows also that Eugene wrote checks to cash in substantial amounts which were charged to purchases on his books. Of the many cash checks which Eugene must have written, a comparatively few are in evidence; but in almost every instance these checks written to cash fail to show any endorsement indicating the purpose of the check or the ultimate recipient of the funds. Books maintained by Eugene's bookkeeper purport to show little more than cash receipts and disbursements. In some instances the name of the vendor in a purchase transaction is indicated, but in many instances a credit to purchases is explained by only the notation "cash" or "sweeps," etc. A ledger contains monthly totals from what purported to be *97 the cash journal, and the tax returns appear to have been prepared from the ledger accounts. Audit of these books was difficult for both the agent for respondent and the accountant retained by petitioner. We do not have summaries of the books nor the results of the audits, but it is apparent from the books that little information as to the source of substantiation for entries can be obtained from them. Witnesses disclaimed any personal knowledge of the books; they were offered into evidence without objection but also without identification or explanation. The bookkeeper who maintained them and who was employed by Eugene during the critical years was not called as a witness. Eugene was deceased at the time of the trial. So we have no explanation by anyone concerned with keeping the books just how the information for making the entries was obtained or what the entries were intended to reflect. Many of the purported payees of cash payments cannot now be located. We can understand the difficulties of petitioner under the circumstances - the lapse of time, inadequate books and records, Eugene's death, the unavailability of witnesses, black-market payments of which there would probably *98 be scant record by the recipient - but we must hold that petitioner has failed to demonstrate that respondent should have allowed credit for more purchases than was allowed. Respondent's disallowances relate to specific items; it is not a disallowance of all or an arbitrary percentage of Eugene's reported purchases. The checks disallowed by respondent have been stipulated, all were drawn to cash, and it has further been stipulated that these checks, listed in our findings, were charged as purchases on Eugene's books. Without substantiation we cannot accept the book entries as proof that the checks to "cash" were for purchases. The books are admittedly inadequate and we believe them to be incomplete. There is no evidence that the entries they do contain are accurate. In addition to the books, petitioner relies upon two bills found among Eugene's records. The first is the Nassel bill in the amount of $14,949.65, dated June 5, 1953. It is argued that six checks dated May 29 through July 27, 1953, disallowed by respondent and totaling $13,968.75, were in payment of this bill. The books offer no indication that they were paid to Nassel. The bill was not identified by Nassel or by anyone *99 familiar with his handwriting and we doubt seriously that it was prepared by Nassel. It is not marked paid and does not purport to have been signed by Nassel. Respondent has allowed other cash checks supposedly in payment of similar bills where the dates and amounts coincided but we cannot, solely on that basis, find that the bill in question was rendered for purchases or that it was paid with funds from the six checks payable to "cash." We have less reason to doubt the authenticity of the Rudisch bill dated February 5, 1954, and described in our findings, but we can tie no disallowed checks to it. It was in the amount of $2,500 and no disallowed check, or combination of them, was in that amount. Petitioner argues that the two checks drawn to cash dated February 4 and 8, in the amounts of $4,000 and $1,000, respectively, could have been used to pay this bill, the exact amount of which does not appear to be recorded in purchases on petitioner's books. However, it seems just as reasonable to assume that the check dated February 4, 1954, payable to Rudisch in the amount of $3,039.40, which was recorded as a purchase, was used to pay this bill. Petitioner also argues that this bill *100 evidences a purchase by Eugene of 29,000 ounces of silver nitrate at 50 cents an ounce in 1954 and that disallowed checks in 1954 in the amount of $14,500 must have been for silver nitrate purchases from Rudisch. But this is surmise. Eugene's books indicate many purchases from Rudisch and identify him by name. There would be no reason why he would not be identified in the silver nitrate transaction if the purchases had in fact been transacted with him. Furthermore, the notation on the bill, which is dated February 5, indicates a balance due of 24,000 ounces whereas all except the above two checks drawn to cash and disallowed by respondent for 1954 were dated in January. The evidence indicates that other checks allowed by respondent were not in payment of this particular bill, but, for reasons stated below, we are not convinced that all of Eugene's cash transactions appear on his books, or, for that matter, were evidenced by checks to "cash." And if Eugene was dealing with cash funds that did not appear on his books and even if he paid the Rudisch bill from such a fund, we have no evidence that gross receipts, unrecorded and unreported, were not used to make such a payment. In 1953 *101 two of the checks disallowed by respondent were endorsed and cash by Warren, and two others by another employee. They gave the money to Eugene. This is the extent of definite testimony. That he used the funds for purchases is, in the last analysis, supposition on the part of the witnesses. One check in 1953 was endorsed by Rudisch. We know nothing more about it. It had no relation to the bill discussed above. Respondent correctly disallowed the cash checks in issue. Petitioner contends further that purchases, in addition to those claimed on the returns, should be allowed in the total amount of $48,044.88 for the 4-year period. No breakdown of this amount has been made for each year in controversy, or for the 2-year period 1953-1954 not barred by the statute of limitations. It appears that Eugene dealt with K & L, also a refiner of metal. His books so indicate. K & L maintained a ledger account for transactions with Eugene. Petitioner has adduced this account in evidence, arguing that, since debits exceed credits for metal, the account shows that Eugene bought more metal from K & L than he sold that firm and that the excess should be added to Eugene's purchases. K & L's ledger appears *102 to have been kept on an accrual basis; Eugene's books purport to be on a cash basis. Obviously, Eugene's books do not reflect all the transactions reported on the K & L ledger in any particular year, [6] but it is argued that we must accrue this excess of purchases over sales because Eugene, who reported inventories, should have been on the accrual basis. But he was on the cash basis unquestionably and neither party herein has attempted to reconstruct his income on any other basis. We cannot do so. If entries from K & L ledger be taken as the basis for the accrual of purchases by Eugene, and if his cash purchases from K & L as claimed be omitted, Eugene's net income from his business would appear to be reduced $18,186.29 for 1953 and increased $58,289.46 for 1954. The results are of course far from those sought by either party and it would be artificial to put Eugene on an accrual *103 basis as regards only this one supplier. It is to be noted that if the K & L ledger be accepted as accurate, cash transactions involving substantial amounts were not recorded on Eugene's books. Since petitioner's accountant has testified that he can reconcile the bank account with cash transactions per Eugene's books, it is a fair inference that Eugene was dealing with cash funds that went undeposited in the bank account and unrecorded on his books. Suffice it to say that the record lacks convincing proof of petitioner's allegations regarding purchases, and respondent's determination is sustained. The next issue relates to the credit for a dependency exemption claimed for Warren for 1953. We believe petitioner has sustained the burden of proving that this credit should be allowed. Warren has testified that he was discharged from the service in January 1953 and that he lived for the rest of 1953 with his parents, deriving all of his support from them. He did odd jobs for his father and was given $10- $15 spending money from time to time, but he was paid no compensation as such by his father. From his testimony, it is clear that his support was not intended as wages. He had no *104 definite job or duties at his father's business. He had no other means of support. We hold for petitioner on this issue. The next issue is whether petitioner is entitled to a deduction in 1954 for gifts made by Eugene at Christmastime. Very little evidence was submitted on this issue, and none to show how these gifts were related to Eugene's business; nor is the latter point argued on brief. From the meager facts of record, set forth in our findings, we must sustain respondent's disallowance of the claimed deduction. The final issue is whether petitioner is liable for the addition to tax for negligence for the years 1953 and 1954. The liability is to be imposed if any part of the deficiency is due to negligence or to intentional disregard of rules and regulations. Sec. 293(a), I.R.C. 1939; sec. 6653(a), I.R.C. 1954. To prevail, petitioner must prove that imposition of this addition to tax would be erroneous. David Courtney, 28 T.C. 658 (1957); J. T. S. Brown's Sons Co., 10 T.C. 840 (1948). Petitioner maintains that there is no evidence of negligence. We disagree, and while we would hesitate to sustain imposition of the penalty *105 if petitioner had merely failed to prove the purchases claimed on the returns, we believe that there is affirmative evidence of Eugene's failure to maintain complete and accurate records of his cash transactions. His neglectful or deliberate failure to do so caused the deficiencies which we have found to be due. The fact that Eugene's incomplete and inaccurate books were probably due to his black-market operations cannot be accepted as an excuse. Petitioner argues that Lillian, whose estate is petitioner herein, was not active in Eugene's business and had nothing to do with keeping the books or preparing the tax returns, and should therefore not be charged with an addition to tax for negligence, relying on L. Glenn Switzer, 20 T.C. 759 (1953), for support of this argument. Petitioner's reliance on that case is misplaced. The two wives involved there filed separate returns reporting their share of the community income derived from their husbands under the community property laws of California. Here Eugene and Lillian filed joint returns for the years 1953 and 1954 and their liability for the negligence penalty as well as for the tax was joint and several. If Eugene was *106 liable for the addition to tax, which we think he was, Lillian was also liable therefor. Myrna S. Howell, 10 T.C. 859 (1948), affirmed per curiam 175 F. 2d 240 (C.A. 6, 1949); William G. Lias, 24 T.C. 280 (1955), affd. 235 F. 2d 879 (C.A. 4, 1956), certiorari denied 353 U.S. 935 (1957). Respondent is sustained on this issue. Decision will be entered under Rule 50. Footnotes
1. Statutory references are to the Internal Revenue Code of 1939. But see footnote 2. ↩
2. This addition to tax is determined under section 6653(a), I.R.C. 1954↩.
3. Warren also executed agreements on behalf of Eugene and Lillian as administrator of the estates of both.↩
4. Of these totals, the amount of $5,000 was originally shown as a cash receipt and a sale to K & L; the entries were erased as sales but recorded as cash receipts.↩
1. Changed by pencil to $2,000.↩
5. Respondent's printed consent form contains the following instruction: "If executed with respect to a year for which a JOINT RETURN OF A HUSBAND AND WIFE was filed, this consent must be signed by both spouses unless one spouse, acting under a power of attorney, signs as agent for the other."↩
6. The K & L ledger debited Eugene's account for the value of metal transferred to him and credited the account for the value of metal transferred from Eugene to K & L, presumably even though no cash exchanged hands. Eugene's books reflect no exchanges of metal unless he received or paid cash therefor.↩